IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

RON duBOIS and THORA duBOIS,      )
Husband and Wife, and as Co-Special )
Administrators of the Estate of   )
Peter duBois, Deceased,           )
                                  )
                Plaintiffs,       )
                                  )
v.                                )          Case No. CIV-12-40-L
                                  )
ADVANCED CORRECTIONAL             )
HEALTHCARE, INC., et al.,         )
                                  )
                Defendants.       )

# O R D E R

On July 12, 2010, Peter duBois was arrested by the Tulsa, Oklahoma Police

Department. Due to an outstanding arrest warrant, Peter[1] was transferred to the

Payne County Detention Center on July 13, 2010. During the booking process at the

Detention Center, Peter was asked questions in order to complete a medical

questionnaire.[2]  The questionnaire requires the booking officer to make a visible

assessment of the prisoner, including whether the prisoner has any visible signs of

alcohol or drug withdrawal, appears to be under the influence of any drugs or

alcohol, or appears to have any psychiatric problems. Exhibit 8 to Hauf Motion at

---

[1]Plaintiffs Ron and Thora duBois are Peter duBois' parents and the co-special administrators of his estate. For the sake of clarity, the court will refer to Peter duBois by his first name. Mr. and Mrs. duBois will be referred to as plaintiffs.

[2]Exhibit 2 to Defendant R.B. Hauf's Motion for Summary Judgment and Brief in Support at 80 (Doc. No. 73) [hereinafter cited as "Hauf Motion"]. The exhibits attached to Defendant Reese Lane's Motion for Summary Judgment and Brief in Support (Doc. No. 74) are identical to those attached to the Hauf Motion. For ease of reference, the court's reference to exhibits attached to the Hauf Motion includes those attached to Lane's motion.

1.  The booking officer must then ask the prisoner a series of questions about preexisting medical conditions.  Id.  According to the form, Peter indicated he suffered from arthritis in his back, tachycardia, high blood pressure, and depression. Id.  The questionnaire reflects that Peter took medicine to control his heart condition and blood pressure, but that he did not have the medication on his person.  The questionnaire also notes that Peter responded in the negative when asked "[d]o you have any problems when you stop drinking or using drugs?" and "[h]ave you ever attempted suicide or are you thinking about it now?"  Id. at 2.

The same date he was booked, Peter submitted a Sick Call Request Form on which he asked to see the doctor or nurse due to "withdraws (sic) from Methadone, Arthritis in Back, Tackacardia (sic), High blood pressure."  Exhibit 10 to Hauf Motion. Peter indicated he was currently taking Methadone, as well as medications to treat pain and high blood pressure.  Id.  At the time of Peter's incarceration, medical care at the Detention Center was provided by defendant Advanced Correctional Healthcare, Inc. ("ACH").  See Exhibit 44 to Appendix of Exhibits to Plaintiffs' Response to Motions for Summary Judgment Filed by All Defendants at 29 (Doc. No. 95) [hereinafter cited as "Plaintiffs' Appendix"].  On July 14, 2010, Peter was seen by Christy Williams, a licensed practical nurse employed by ACH.  Williams' chart notes reflect that Peter complained he was unable to eat or drink, his heart felt like it was jumping out of his chest, he was dehydrated, shaky, and nauseated. Exhibit 11 to Hauf Motion.  In her notes, Williams indicated she would "contact

[doctor] for orders for withdrawls (sic)".  Id.  Williams contacted Dr. Charles Olson, Jr., the ACH doctor on call, who authorized giving the following medications to Peter: 50 milligrams of Vistaril[3] to be given by mouth twice daily for three days; 0.1 milligrams of Clonidine[4] to be given by mouth twice daily for three days; 10 milligrams of Celexa to be given by mouth daily; and 50 milligrams of Metoprolol to be given by mouth twice daily.  Exhibit 11 to Hauf Motion at 1.  Although Olson authorized continuation of two medicines Peter had been taking,[5] he did not authorize Peter's continued use of Methadone, the last dose of which he had taken the morning of July 12, 2010.  Exhibit 5 to Plaintiffs' Appendix.  Williams scheduled Peter to see Olson on July 21, 2010, which was the next time the doctor was scheduled to be at the Detention Center.

The Clonidine and Vistaril were prescribed to treat Peter's Methadone withdrawal symptoms.  Exhibit 3 to Hauf Motion at 58.  Peter received his first dose of Vistaril at 6:00 p.m. on July 15, 2010 and his last dose on July 18, 2010 at 6:00 a.m.  See Exhibit 13 to Hauf Motion.  Clonidine was first given to Peter at 6:00 p.m.

---

[3]Vistaril is an antihistamine, which "is commonly used for itching . . . anxiety and panic disorder, it also can be used for nausea."  Exhibit 24 to Plaintiffs' Appendix.

[4]Clonidine is a blood pressure medication.  Dr. Olson testified that "it helps with the rapid heart rate, can help a little bit with agitation or difficulty sleeping."  Exhibit 24 to Plaintiffs' Appendix at 29.

[5]Prior to his incarceration, Peter had been taking the same doses of Clonidine and Metoprolol that Olson prescribed.  See Exhibit 5 to Plaintiffs' Appendix.

on July 14, 2010, and the last dose was given to him on July 18, 2010 at 6:00 p.m.[6] Id. Although both parties' experts acknowledge that opiate withdrawal can be painful,[7] there is no indication in the record that Peter was ever given any medication for pain.

After booking, Peter was initially placed in what is known as the "south detox observation cell" where he was checked by Detention Center staff every 15 minutes. The Observation Checklist reflected the reason for Peter's cell assignment was "methadone". Exhibit 9 to Hauf Motion. After seeing Williams, Peter was moved from the detox cell to cell C103, where he remained for less than 10 minutes. Exhibit 42 to Plaintiffs' Appendix. Peter was then placed in cell H106,[8] which Williams authorized because it "was warmer, quieter" and he "would have an emergency button right there in his cell that he could push if he had problems." Exhibit 4 to Hauf Motion at 141. Peter remained in cell H106 until 6:06 p.m. on July 15, 2010 when he was moved back to south detox for allegedly hiding medication on his person. Exhibit 42 to Plaintiffs' Appendix. Less than 24 hours

---

[6]Although the script called for Peter to receive two doses of Clonidine daily for three days, he received only one dose on July 14 and 15, and two doses on July 16, 17, and 18. Exhibit 13 to Hauf Motion.

[7]See Exhibit 8 to Plaintiffs' Appendix at 57 ("There are muscle pains, sometimes described as bone pain. There is just intense discomfort, which patients often are unable to really describe, but they're certainly – in my experience, it exists and it can be very, very serious."); Exhibit 9 to Plaintiffs' Appendix at 17, 31("The symptoms of detox, tearing, nausea, vomiting, body aches, malaise"; a person going through withdrawal can have up to "six weeks of bone aches").

[8]Exhibit 42 to Plaintiffs' Appendix. Cell H106 is in the H pod of the Detention Center. The H pod is a general population confinement area, although it normally houses sex offenders and prisoners in protective custody. Exhibit 2 to Hauf Motion at 48.

later, Peter was transferred to C pod in the general population of the Detention

Center.  Id.

Prior to May 2010, the jail's written policies provided for "gradual, supervised

detoxification programs for substance abusers".  Exhibit 40 to Plaintiffs' Appendix at

30.  The written policies provided:

> It is expected that most substance abuse cases can be managed in the jail under normal circumstances.
>
> * * *
>
> When the jail physician deems in-house detoxification care as (sic) sufficient, the inmate's individual treatment program will specify housing requirements, treatment procedures, or any necessary referrals.
>
> Medical staff will inform the inmate management team of any diagnosis of chemical dependency and will determine if the inmate requires any special housing such as confinement in a single cell for detoxification purposes.
>
> When an inmate is diagnosed as being so chemically dependent as to require on-going medication, the jail physician will develop an individualized treatment program.  In these cases, the inmate will remain under medical staff supervision at all times during their withdrawal period.

Id. at 30-31.  Once ACH began providing health care at the Detention Center, the

detoxification policy was superseded by an ACH protocol.  Exhibit 2 to Hauf Motion

at 126-27.  The ACH opiate withdrawal protocol provided that the inmate was to be

placed "in holding observation unit" and that "Medical is to see all detainees who

have been treated with withdrawal protocols."  Exhibit 25 to Plaintiffs' Appendix at

1.  The protocol specified the medication of choice was 25 milligrams of Vistaril twice

a day for five days together with 0.2 milligrams of Clonidine twice a day for five days.

Id.  Finally, the protocol instructed "**If detainee has any medical issues, or after**

**5 days of treatment, re-evaluate and call physician for further orders.**"  Id.

(emphasis in original).

Likewise, the jail's prior written policy regarding suicide was superseded once

ACH began providing healthcare services at the Detention Center.  Exhibit 2 to Hauf

Motion at 126-27.  The suicide management/risk reduction policy in effect prior to

May 2010 provided that

> Detention Officers in housing units or other persons will advise the Shift Supervisor of any potentially self-destructive behavior (related to a potential suicide) displayed by an inmate.

> If an inmate declares a Psychological Emergency the Shift Supervisor will be advised.  The Shift Supervisor will notify the appropriate [Qualified Health Services Staff ("QHSS")].

> * * *

> When observation, history, or interview suggests than an inmate is potentially suicidal, the following steps will be implemented by QHSS, or in the absence of Health Services staff, the Duty Officer.

> a.   The inmate may be kept in an approved Isolation Management Room (IMR) for closer observation.

    b.    The inmate may be placed on a Suicide Observation Status (SOS-I, SOS-II, Constant Observation).

    c.    The inmate may be referred to an appropriate outside treatment facility for further evaluation. (Decision is sole province of Medical/Mental Health Staff, with approval by Jail Administrator or designee.) In all cases, referral to a local hospital emergency department is an option.

Exhibit 40 to Plaintiffs' Appendix at 43. The record does not reflect whether ACH had a suicide prevention protocol as neither party provided one to the court. Williams, however, testified that she received no specialized training on opiate withdrawal or suicide prevention. Exhibit 17 to Plaintiffs' Appendix at 35.

On July 19, 2010 – the day after Peter received the last doses of the medication prescribed for his withdrawal symptoms – Peter committed suicide by diving off the second floor of the Detention Center. As a result of the fall, Peter sustained serious head injuries and subsequently died on July 23, 2010. Prior to the fall, a fellow inmate, Kenneth Eugene Lane, Jr.,[9] notified various jailers – including Nick Myers who was a lieutenant – that Peter was talking about committing suicide. Exhibit 27 to Plaintiffs' Appendix at 32-37. Each time Kenneth expressed concern about Peter, the jailer in question would say that he would pass the information on to the medical staff. Id.

---

[9]Because this witness and defendant Lane have the same last name, the court will refer to Kenneth Eugene Lane, Jr. as Kenneth.

On January 12, 2012, Peter's parents, as co-special administrators of his estate, filed this action seeking damages pursuant to 42 U.S.C. § 1983 for violations of Peter's constitutional rights.[10]  With respect to the § 1983 claims, plaintiffs named as defendants the Board of County Commissioners of Payne County ("County"); the Payne County Sheriff's Office; R.B. Hauf in his official capacity as the Sheriff of Payne County and in his individual capacity; and Reese Lane in his official capacity as the jail administrator for the Payne County Detention Center and in his individual capacity.

This matter is before the court on separate motions for summary judgment presented by Hauf and Lane.  Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Any doubt as to the existence of a genuine issue of material fact must be resolved against the party seeking summary judgment.  In addition, the inferences drawn from the facts presented must be construed in the light most favorable to the nonmoving party. Board of Education v. Pico, 457 U.S. 853, 863 (1982).  Nonetheless, a party opposing a motion for summary judgment may not simply allege that there are disputed issues of fact.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249

---

[10]Plaintiffs also asserted a state law wrongful death claim against ACH.  Complaint at ¶¶ 35-46 (Doc. No. 1).  On May 3, 2013, the court entered an order denying ACH's motion for summary judgment.  On May 14, 2013, plaintiffs settled their claim against ACH.  Enter Order at 1 (Doc. No. 122).

(1986).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).  In addition, the plain language of Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Hauf and Lane seek judgment in their favor both in their official capacities and in their individual capacities.  They argue plaintiffs cannot demonstrate that either defendant violated Peter's constitutional rights and therefore they are not liable as a matter of law.  In addition, Hauf and Lane contend they are entitled to qualified immunity in their individual capacities because it was reasonable for them to rely on ACH "to assess and treat Peter and to rely on the approval from these trained medical professionals that Peter could be housed in general population".  Hauf Motion at 27.

"Under the Fourteenth Amendment due process clause, 'pretrial detainees are . . . entitled to the degree of protection against denial of medical attention which applies to convicted inmates' under the Eighth Amendment."  Martinez v. Beggs, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting Garcia v. Salt Lake County, 768 F.2d

303, 307 (10th Cir. 1985)).  Prison officials violate the Eighth Amendment if their "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain".  Estelle v. Gamble, 429 U.S. 97, 104 (1976).

> The test for a "deliberate indifference" claim under the Eighth Amendment has "both an objective and a subjective component."  The objective component of the test is met if the harm suffered is "sufficiently serious" to implicate the Cruel and Unusual Punishment Clause.  The subjective component "is met if a prison official 'knows of and disregards an excessive risk to inmate health or safety.'"

Kikumura v. Osagie, 461 F.3d 1269, 1291 (10th Cir. 2006) (citations omitted).  The subjective component requires that the defendant in question "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  The official, however, need not be aware "of a substantial risk to a *particular* inmate, or [have] knowledge of the particular manner in which the injury might occur."  Tafoya v. Salazar, 516 F.3d 912, 916 (10th Cir. 2008) (emphasis in original).  Moreover, a jury may infer that a prison official has knowledge of the substantial risk of injury based on the obviousness of the risk.  Id. at 916-17.

Plaintiffs seek to hold Hauf and Lane liable in their individual capacities because of their actions as supervisors.  However,

> [a]s a general matter, § 1983 does not recognize a concept of strict supervisor liability; the defendant's role

10

> must be more than one of abstract authority over individuals who actually committed a constitutional violation. *Jenkins v. Wood,* 81 F.3d 988, 994–95 (10th Cir. 1996). Yet in situations where an "'affirmative link' exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise," the supervisor may be personally liable. *Butler v. City of Norman,* 992 F.2d 1053, 1055 (10th Cir. 1993).

Fogarty v. Gallegos, 523 F.3d 1147, 1162 (10th Cir. 2008).

Hauf and Lane concede that suicide is a sufficiently serious medical need such that the objective prong of the Eighth Amendment test is met. The issue in this case is the subjective prong. Defendants argue plaintiffs cannot establish this component because neither Hauf nor Lane knew that Peter was suicidal. Plaintiffs counter that because Kenneth told certain jail staff that Peter was suicidal, the jury could infer knowledge by Hauf and Lane. Moreover, plaintiffs argue, the risk of suicide by a person undergoing opiate withdrawal was so obvious that actual knowledge of the risk and defendants' deliberate indifference to that risk can be inferred.

Having examined the evidence presented in light of the standards for individual liability enunciated above, the court concludes that Hauf and Lane are entitled to judgment in their favor. In keeping with its duty to view the facts in the light most favorable to plaintiffs, the court assumes that Kenneth told various members of the jail staff that Peter was suicidal. Plaintiffs, however, have submitted no evidence that this information was ever transmitted to Hauf or Lane. Indeed, both

11

Hauf and Lane testified they had no actual knowledge that Peter was suicidal, and plaintiffs have presented nothing other than the conjecture that this issue might have been raised at meetings Lane attended.[11]   This case is therefore distinguishable from Layton v. Board of County Comm'rs of Oklahoma County, 2013 WL 925807 (10th Cir. Mar. 12, 2013) (unpublished).   In Layton, the Court found there was sufficient evidence that the Sheriff of Oklahoma County "was on notice of constitutional deficiencies in the care of seriously ill detainees, and that his failure to take appropriate measures to remedy these deficiencies constituted deliberate indifference."   Id. at *10.[12]

In addition to not providing evidence of personal participation by Hauf or Lane, plaintiffs have not alleged the violation was the result of a failure to train or supervise jail employees or that it was at the direction of Hauf or Lane.   The only connection between Hauf and Lane and the constitutional violation is the supersession of the policies in effect prior to May 2010.   There is, however, no evidence that Peter's suicide would have been avoided if the prior policies had been in effect .   The prior

---

[11]See Plaintiffs' Response at 16-17 ("Plaintiffs contend that, contrary to his position, Defendant Lane was informed that Peter duBois was suicidal based on the number of inmates in the jail who were aware of it and based on the knowledge of his assistant jail administrator.") (footnote omitted).   Plaintiffs, however, have presented no evidence that the information was relayed to Lane much less Hauf.   While the court must draw all inferences from the facts in the light most favorable to plaintiffs, those inferences must have a basis in fact and must be reasonable.

[12]In Layton, plaintiffs presented several documents, all of which preceded the events at issue, "that evince deficiencies in the medical care that the jail furnished to prisoners."   Id. at *2. Included in these documents were a report from the United States Department of Justice and numerous reports issued by the Oklahoma State Department of Health.   Id.   In contrast, plaintiffs have not presented a similar paper trail.

substance abuse policy provided that medical staff would determine housing requirements for an inmate going through withdrawal,[13] and that is what occurred in this case. Williams authorized Peter's placement in the general population after she saw him on July 14, 2010. Exhibit 4 to Hauf Motion at 140-41. Whether this was the correct placement for Peter given what transpired can be argued, but it cannot disputed that medical staff made the determination to remove him from the detox cell.[14] Likewise, the prior policy on suicide prevention required jail staff to notify a shift supervisor if an inmate was suicidal; the shift supervisor, in turn, would notify medical. *See supra* at 6. According to Kenneth's testimony, each time he told a staff member that Peter was suicidal, the response was that medical would be notified. *See* Exhibit 27 to Plaintiffs' Appendix at 32-33, 35, 37-38. This response is in keeping with the prior policy. Finally, the court concludes plaintiffs have not presented sufficient evidence to create a triable issue as to whether the risk of suicide due to opiate withdrawal was so obvious that a jury could infer that Hauf and Lane were aware of that risk and were deliberately indifferent when they decided to abandon the prior policies. While the record reflects that three other suicide attempts were made at the Detention Center in 2009, there is no evidence they were related to drug or alcohol withdrawal. *See* Exhibits 36-38 to Plaintiffs' Appendix.

---

[13]*See supra* at 5.

[14]Plaintiffs argue that medical should have been contacted before Peter was transferred out of the south detox cell on July 16, 2010. Peter's transfer to the south detox cell, however, was not at the direction of medical, but rather was due to his hiding contraband. Exhibit 42 to Plaintiffs' Appendix; Exhibit 2 to Hauf Motion at 99-100.

13

Plaintiffs, therefore, have not established a basis for supervisory liability under §
1983, and Hauf and Lane are entitled to judgment in their favor with respect to
plaintiffs' claims against them in their individual capacities.

The official capacity claims against Hauf and Lane are the equivalent of suing
the county.[15]  As with supervisory liability, municipal liability may not attach under §
1983 solely on the basis of *respondeat superior*.  *See* Monell v. Dep't of Social
Services, 436 U.S. 658, 694 (1978).  Rather, a municipality is not liable under § 1983
unless there is an affirmative link between the alleged constitutional deprivation and
the municipality's control, direction, or failure to supervise.  *See* Meade v. Grubbs,
841 F.2d 1512, 1527 (1988).  "[I]t is not enough for a § 1983 plaintiff merely to
identify conduct properly attributable to the municipality. The plaintiff must also
demonstrate that, through its *deliberate* conduct, the municipality was the 'moving
force' behind the injury alleged."  Bd. of Count Comm'rs of Bryan County v. Brown,
520 U.S. 397, 404, (1997) (emphasis in original).  Plaintiffs must also establish "that
the municipal action was taken with the requisite degree of culpability",[16] which in
this case is deliberate indifference.  Deliberate indifference in the municipal liability
context is an objective standard that

> may be satisfied "when the municipality has actual or
> constructive notice that its action or failure is substantially
> certain to result in a constitutional violation, and it

---

[15]Lopez v. LeMaster, 172 F.3d 756, 762 (10th Cir. 1999).

[16]Id.

> consciously and deliberately chooses to disregard the risk
> of harm." Although a single incident generally will not give
> rise to liability, "deliberate indifference may be found
> absent a pattern of unconstitutional behavior if a violation
> of federal rights is 'highly predictable' or 'plainly obvious'
> consequence of a municipality's action." The official
> position must operate as the "moving force" behind the
> violation, and the plaintiff must demonstrate a "direct
> causal link" between the action and the right violation.
> That is, "[w]ould the injury have been avoided had the
> employee been trained under a program that was not
> deficient in the identified respect?"

Olsen v. Layton Hills Mall, 312 F.3d 1304, 1318 (10th Cir. 2002) (citations omitted).

The court's analysis with respect to supervisory liability is directly applicable to the

municipal liability issue. Plaintiffs cannot establish that the Sheriff had notice of a

high risk of suicide due to opiate withdrawal or that the Sheriff "consciously and

deliberately" chose to disregard that risk by abandoning the pre-2010 policies.

Moreover, plaintiffs have not demonstrated that the change in policies was the

moving force behind Peter's suicide; that is, they have not shown that Peter's injury

would have been avoided had the prior policies been in effect in July 2010.

While Peer's death was tragic, the court cannot find liability for that death rests

with Hauf of Lane. Therefore, for the reasons set forth above, Defendant R.B.

Hauf's Motion for Summary Judgment (Doc. No. 73) and Defendant Reese Lane's

Motion for Summary Judgment (Doc. No. 74) are GRANTED. In light of this ruling,

Defendants Hauf and Lane's Motion in Limine (Doc. No. 119), Defendants Hauf and

Lane's Motion for Leave to File Supplemental Motion in Limine (Doc. No. 123), and

Plaintiffs' Motion in Limine (Doc. No. 124) are DENIED as moot.  As plaintiffs have settled their claims against Advanced Correctional Healthcare, Inc. and the court has dismissed the Board of County Commissioners of Payne County (Doc. No. 115), judgment in this case will issue accordingly.

It is so ordered this 17th day of May, 2013.

_Tim Leonard_

TIM LEONARD
United States District Judge